JAMES D. C. JACKSON, PETITIONER-RESPONDENT, v. NEW YORK SHIPBUILDING CORPORATION, RESPONDENT-PROSECUTOR.

Submitted October 5, 1937—Decided February 17, 1938.

Before BROGAN, CHIEF JUSTICE, and Justices TRENCHARD and PARKER.

For the petitioner-respondent, *Bartholomew A. Sheehan* (*Samuel P. Orlando,* of counsel).

For the respondent-prosecutor, *Rocco Palese.*

BROGAN, CHIEF JUSTICE. This is a workman's compensation case. The referee dismissed the petition holding, in effect, that an accident arising out of and in the course of the employment had not been proved. On appeal, the Court of Common Pleas of Camden county reversed, holding that the petitioner had "suffered an accident arising out of and

in the course of his employment," and awarded compensation for the loss of his left eye. This court allowed *certiorari*.

The question before us is entirely one of fact. The petitioner was employed by the respondent as a ship fitter. On December 28th, 1934, when the petitioner claimed he suffered the accident in question, he was working on a vessel known as "contract No. 414." His duties brought him to the inside as well as the outside of the ship. The petitioner testified that throughout the day, at different intervals, he worked in what is known as the "peak" of the vessel which he said was about twenty-five feet long and twenty feet wide by fifteen feet high, and while there at those intervals (from one-half an hour to as long as an hour) was exposed to the bright glare of arc lights made by welding machines. The petitioner didn't use goggles or eye protectors, nor was he required so to do. He was not engaged to operate these welding devices but the work which he was performing took him into their vicinity.

On the day in question, when the petitioner had reported for work, he didn't feel well. He had what he described as a "grippy" feeling, but, none the less, he worked all day and felt no eye discomfort or irritation of the eyes during the day until he was on his way home in the evening, when he noticed "they just felt like someone would take a handful of sand and throw it in your eyes and cause your eyes to water all the time." He had suffered similar irritations previously when he worked with or close to the welders.

On reaching home that night, his wife sent for the family doctor to treat the petitioner for grippe and meanwhile prepared a home-made remedy of potato poultice to ease the eye irritation. A second doctor was called a few days later to attend the petitioner only because he was not responding to the treatment prescribed by the first doctor for grippe. The second physician, Dr. Jameson, noticing the home-made remedy petitioner had applied to his eyes, suggested other treatment. This physician was not an eye doctor and frankly says so in his testimony. When the eyes didn't improve under the use of argyrol and boric acid, Dr. Jameson suggested

calling in an eye specialist. Dr. Shemeley, an eye specialist, was called on January 4th, 1935, and prescribed treatment. Petitioner saw this same doctor again on January 7th, at which time he was told to go to the Wills Eye Hospital for observation and further treatment. He went to the hospital forthwith and was there for four weeks under the regular treatment of Dr. O'Brien, also an eye specialist. Dr. O'Brien, after several weeks of observation and treatment, removed the left eye. Prior to the time the petitioner suffered the eye irritation, his eyes were normal and he didn't require glasses except to read or to draw on a blue print, and the glasses he used on these occasions were regular reading glasses. This was his testimony.

Now the petitioner claims that the eye infection and loss of the eye was due to his exposure, in the discharge of the duties of his employment, to these electric "flashes" which were caused by the welding arcs. Dr. O'Brien supported the petitioner's claim for compensation, and testified that the petitioner had an abscess of the eye, technically called panophthalmitis, which he described as an inflammation of all the structure of the eye from "within out." Dr. O'Brien further testified that he had received from the patient a history of the occurrence of the "flash" at the time of petitioner's admission to the hospital and that he treated him daily until he operated on him, and removed the eye, and also afterwards up to January 30th, when he was discharged. His opinion was that the "flashes," so called, irritated the eyes and caused the petitioner to rub them by which action he started up virulent organisms or sources of infection (which the witness says is present in almost every eye) to such an extent that these organisms broke through the front of the eye and resulted in an infection of the entire organ. He testified that the infection did not come from within, i. e., from the inside of the eye or from any source in back of the eye; that no infection came from the sinuses, and this he determined after removing the eye and upon examination of the eye socket and the recesses therein; that there was no pathological change in the bone of the socket. He further testified that the influ-

enza from which the petitioner suffered on December 28th, and for a week or more thereafter, was not the cause of the eye condition.

Three doctors testified for the respondent. Dr. Jameson's testimony is of little help since he frankly says that he is not an eye specialist. Dr. Shemeley saw the defendant twice, first on January 4th, and again on January 7th, and testified from his notes of what he found on these occasions. He was of the opinion "that the condition that you found was not due to a flash burn." Later this witness admitted that it was possible for a flash burn to clear up in twenty-four hours. In this case, it was a week after the alleged happening that this doctor first saw the petitioner. However, the witness stated, emphatically, that in his opinion the exposure of the petitioner to these flashes from a welding machine would not have any effect on his eye.

A Dr. George Dublin was next called by the respondent. He examined the petitioner on April 12th, 1935, some months after the eye had been removed. His testimony is hypothetical and theoretical in character. His opinion that the infection came from within and not as a result of the arc-welding flashes is predicated on symptoms and conditions stated in the notes made by Dr. Shemeley on the two occasions on which he saw and examined the petitioner. Dr. Shemeley's conclusions were based upon his examination of the petitioner and X-ray pictures of the diseased organ. Dr. O'Brien's testimony, on the other hand, was based on his constant attendance of the petitioner as well as the post-operative examinations made by him. These, particularly the latter, are obviously more informing and valuable than conclusions which rest in part on X-ray pictures.

It is our duty, under the statute, to determine the facts in this case and our judgment is that the finding of the Common Pleas should be affirmed.

The testimony of the petitioner seems to be a candid statement of the pertinent happenings. Dr. Shemeley's testimony to the effect that the conditions under which the petitioner worked had nothing to do with the subsequent infection and

loss of the eye is not impressive when contrasted with the testimony of Dr. O'Brien. Admittedly, the former saw the petitioner only twice, on both of which instances the organ was in a very distressed condition. On the occasion of the second visit, Dr. Shemeley was asked if he made an examination of the left eye on that occasion and his answer was, "it wasn't necessary. The evidence was gross enough. Q. It was gross enough to indicate what? A. An enucleation immediately. Q. Did you prescribe such a course? A. I did." Nothing in the testimony indicates that he ever saw the petitioner again. On the other hand, Dr. O'Brien saw the petitioner daily for weeks. At the end of three weeks he performed the operation, removing the eye, and thereafter kept the petitioner under observation and was able to testify from his examination of the socket in the area behind the eye that the infection which caused the loss of this member did not come from within.

The testimony of the second expert for the respondent being, as we said, predicated on an examination that took place a considerable time after the eye had been removed and resting, in the main, on the charts of Dr. Shemeley, does not turn the scale of evidence in favor of the respondent. It isn't necessary, of course, for the petitioner to carry the burden of proof to the point of demonstration.

Our cases hold that it is sufficient to show a hypothesis that is probable, and this we think the petitioner has done. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.*, 111 *N. J. L.* 487; *Belyus* v. *Wilkinson-Gaddis Co.*, 115 *Id.* 43; *affirmed,* 116 *Id.* 92.

We think the judgment should be affirmed, with costs.