NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

JOHNNIE MAE HARRIS, PETITIONER, v. CITY OF NEWARK, RESPONDENT.

Decided January 23, 1941.

For the petitioner, *David Roskein.*

For the respondent, *James F. X. O'Brien* (by *Joseph B. Sugrue*).

\*   \*   \*   \*   \*   \*   \*

From the stipulation of counsel and the testimony adduced, I find and determine as follows:

That Lonnie Harris, the petitioner's decedent, was in the employ of the city of Newark as a laborer in the refuse division of the Department of Public Affairs, for a period of

twelve years next preceding March 11th, 1939, and was earning $28.80 per week. On that date, while so employed, he suffered an injury by accident arising out of and in the course of his employment with the respondent, the city of Newark, when the employe was struck by a limb of a tree while he was riding on top of a city-owned dump truck, and was thrown to the concrete highway. He was rendered unconscious, and removed to the Newark City Hospital where he remained disoriented, drowsy, confused, and his speech was rambling and irrelevant. A diagnosis showed cerebral concussion and possible fracture of the skull, together with the findings of lacerations to his lower lip and left shoulder. Upon his release from the City Hospital, he continued under the care of the Newark city physician, Dr. E. Fink, until April 7th, 1939, when Harris, having obtained no relief from his painful symptoms, came under the professional care of a physician of his own choosing, who thereafter treated the decedent until his death on July 5th, 1940.

The testimony further discloses that on July 4th, 1940, at approximately ten A. M., the employe collapsed in front of his home, and was at once removed to the Newark City Hospital, where he died the following day. An autopsy which was performed revealed that the immediate cause of death was a spontaneous subarachnoid hemorrhage. It was also indicated that his death was caused by the rupture of a military anurysm of the left anterior cerebral artery, and that "this anurysm had ruptured into the anterior horn of the left lateral ventricle."

The primary issue presented for determination is the relationship, if any, between the admitted compensable accident of March 11th, 1939, and the employe's death.

The medical witnesses who testified on behalf of the petitioner were of the affirmative opinion that there was a causal relationship between the accident of March, 1939, and the petitioner's death on July 5th, 1940. Dr. W. T. Darden who treated the injured employe during his lifetime following the accident and until shortly before his death, Dr. C. C. Beling, a neurologist who had occasion to examine the petitioner on several occasions during his lifetime following the

accident, Dr. Alfred Mamlet, a specialist in diseases of the head, who performed various tests of the petitioner during his lifetime, and Dr. Asher Yaguda, a pathologist, who performed the autopsy of the petitioner's brain, all testified in support of this hypothesis. In addition, lay witnesses consisting of relatives, members of the employe's family, and neighbors testified as to his conduct following the accident.

It would serve no useful purpose to here analyze in detail all the medical and lay testimony adduced. The conclusion is compelling, that the accident which the decedent suffered on March 11th, 1939, was a severe one, and caused definite damage to the structure of his brain, and produced numerous objective and subjective symptoms which disabled him and prevented his pursuit of his normal activities and mode of life. The testimony clearly indicates that following said accident, he suffered from the effects of intense and persistent dizziness, headaches, apprehension, dizzy spells on bending, partial loss of hearing, stammering of speech, and instability of station. In fact, he had been and was receiving active medical treatment for these symptoms up to his collapse and death. The neurological examinations made by both the experts of the petitioner and the respondent, indicate that his symptoms were the sequelae of a concussion of the brain and of the organic damage to the brain that was produced by the industrial accident. The lay witnesses testified in detail as to his unusual actions during the period following this accident. They had occasion to frequently observe him in the neighborhood, unemployed, manifesting the symptoms above enumerated. It also appears that these symptoms necessitated the employe's confinement in and about his home, the treatment of a physician, and endeavors on the part of the employe to obtain relief elsewhere. Such conduct was in marked contrast to his apparent good health, industry, and regular employment prior to the accident. The contention of the petitioner that her husband's death was causally related to the accident of March 11th, 1939, is denied by the respondent. The employer adduced the testimony of Dr. E. Fink, and Dr. H. Davidson a neurologist. It is the respondent's contention that the anurysm which ruptured July 4th, 1940, and resulted in the

collapse of the employe, and his subsequent death, was of a congenital origin, and in no way connected with the accident of March, 1939.

The testimony, without serious dispute, indicates that the petitioner's decedent, a young man of thirty-three years of age, was employed steadily for twelve years, up to the date of the accident, by the respondent, during which time he exhibited no evidence of any head symptometology, and was in apparent good health. On March 11th, 1939, he suffered an admittedly severe injury to his head, which produced both objective and subjective nervous symptoms, and which injury was diagnosed by all the neurologists as a concussion of the brain with organic brain damage. This injury and the ensuing objective and subjective symptoms incapacitated Harris from work on and after the date of said accident. Moreover, the symptoms, which were recurrent, continued up to the time of his death. The credible preponderance of the medical testimony established that while the schools of medical thought are divided as to the etiology, such an anurysm may be produced by trauma. This theory finds abundant support in the case under consideration, in the absence, on autopsy, of any other congenital anomalies. Moreover, it was testified that the anatomic condites of the skull are favorable for the development of a traumatic anurysm, especially at the base of the brain where the arteries are in contact with the bony structures. Thus there is a reasonable basis to conclude that the accidental injury to the brain and blood vessels of March, 1939, which was demonstrated by the persistent evidences of brain damage thereafter, undoubtedly produced severe damage to the arteries and blood vessels of the brain, and from it the anurysm from which the employe died by reason of its subsequent rupture. The findings of Dr. Yaguda, the pathologist, who was present at the autopsy, and personally observed the conditions to which he testified, is obviously more informing and valuable than the conclusions of the respondent's neurologist, who did not witness or participate in the autopsy, but merely rendered his opinion, based on the reports of the autopsy findings of Drs. Martland and Yaguda. *Jackson* v. *New York Shipbuilding Corp.*, 119 *N. J. L.* 542; 197 *Atl. Rep.* 284.

In appraising the evidence, probability and not the ultimate degree of certainty, is the test. *Auten* v. *Johnston,* 115 *N. J. L.* 71; 178 *All. Rep.* 187. The medical testimony adduced by the petitioner satisfies that requirement. The chain of related events which began with the industrial accident, and continued up to the death of the employe, coupled with the affirmative expert medical testimony of the four physicians who appeared on behalf of the petitioner, established, in my opinion, adequate facts from which the proper deducible inferences from a rational basis, that the decedent's death was the result of an accident arising out of and in the course of his employment. *Calicchio* v. *Jersey City Stockyards,* 125 *N. J. L.* 112; 14 *Atl. Rep.* (2*d*) 464; *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; 170 *Atl. Rep.* 22; *Hercules Powder Co.* v. *Nieratko,* 113 *N. J. L.* 195; 173 *Atl. Rep.* 606; *affirmed,* 114 *N. J. L.* 254; 176 *Atl. Rep.* 198; *Belyus* v. *Wilkinson Gaddis & Co.,* 115 *N. J. L.* 43; 178 *Atl. Rep.* 181; *affirmed,* 116 *N. J. L.* 92. The respondent seeks to avoid liability because, as it contends, the anurysm which ruptured and caused the death of the employe, was of congenital origin and wholly unrelated to the accidental injuries suffered by the employe, and its sequelae. The burden of proof in this respect is on the employer. *Atchison* v. *Colgate,* 3 *N. J. Mis. R.* 451; 128 *Atl. Rep.* 598; *affirmed,* 102 *N. J. L.* 425; 131 *Atl. Rep.* 921. From a careful consideration of all the testimony adduced, I find that the respondent has failed to meet and sustain that burden.

I am satisfied that the petitioner has established by competent and compelling proofs, facts and circumstances of such a character as to afford a fair and reasonable presumption that the death of her decedent, Lonnie Harris, was causally related to the injuries which he suffered in the accident of March, 1939, that arose out of and in the course of his employment with the respondent, and I so find.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

JOHN C. WEGNER,
*Deputy Commissioner.*