New Jersey Department of Labor,
Workmen's Compensation Bureau.

ROSE LEE JENKINS, PETITIONER, v. A. ABRAMSON & SON, INC., RESPONDENT.

Decided October 29, 1941.

For the petitioner, *David Roskein.*

For the respondent, *William A. Davenport.*

\*       \*       \*       \*       \*       \*       \*

The real issue in controversy is whether the death of the deceased employee on July 16th, 1940, was hastened by or is causally related to the accident which he suffered on May 14th, 1940. There appears no dispute that the accident in question arose out of and in the course of his employment with the respondent and that the employer had knowledge and notice thereof.

The testimony and proofs adduced disclose that on May 14th, 1940, and for several years prior thereto, the decedent Charles Jenkins had been in the employ of the respondent as a laborer. The work required of him was of a heavy and laborious nature and from the testimony of fellow employees there seems to be little dispute that he appeared to be in good health and performed his routine duties as a laborer in an efficient manner. On May 14th, 1940, the decedent, at the direction of his employer, proceeded with a fellow employee, by means of the employer's truck to Paterson, New Jersey,

to pick up a load of scrap metal. There the decedent and his co-worker proceeded to load the truck with heavy bags of metal. It is uncontroverted that this work required strenuous lifting effort by the man engaged therein. While in the act of raising or lifting a bag weighing about 300 pounds from the floor on to a hand truck, the decedent suddenly dropped his end of the load, "caved in," seized his back and abdomen and exclaimed that he had hurt himself. He remained stooped over, could not move and on his face was an expression of pain. Jenkins ceased working immediately and a substitute was obtained to complete the loading. Upon returning to the respondent's office in Newark, where the accident was reported, the decedent was unable to perform any further work that day and was directed to report to the office of the respondent's physician. He did so that day and there received medical treatment, following which he returned to his home and went to bed. Dr. Szerlip, the first physician to examine and treat the decedent following the accident, made a diagnosis of a mild lumbo-sacral strain. Thereafter, the employee was confined to his home except to leave same for medical care and he continued under Dr. Szerlip's treatment for said injuries until June 7th, 1940. The testimony is that the treatment thus rendered was confined to the injured back. Shortly following the decedent's discharge from active treatment by the attending physician, on June 7th, 1940, he attempted to return to work.

The evidence as to how long he worked following his return is in conflict. The petitioner's proofs indicate that the decedent only worked for half a day and he was then obliged to return home. On the other hand, the respondent's testimony is to the effect that the employee worked for several weeks. In an endeavor to corroborate this, certain time cards were admitted into evidence. These proofs, however, fall short of sustaining the respondent's contention in this regard. The testimony lends itself to the conclusion that the time cards indicated that the respondent paid the decedent his full wages during the period in question. However, in view of the conceded practice of the employer to pay full wages to sick or disabled employees during convalescence, and the affirmative

testimony of the decedent's fellow employees that he only worked for half a day, I am constrained to accept petitioner's proof with respect thereto.

In any event, the evidence is uncontradicted that following the accident the employee's health appeared to deteriorate and grow progressively worse. According to fellow workers, he seemed "too weak to work" was getting thinner and was unable to lift bags even in the performance of "light work." His wife testified that following the accident and during the course of medical treatment, he walked about in a stooped posture, was obliged to use a cane and complained of pains in his back and stomach, which at times interfered with his sleep. Instead of improving as time went by, Jenkins seemed to be getting weaker, lost weight, and exhibited little appetite. Following his unsuccessful attempt to resume work in early June, 1940, he was unable to pursue any other gainful occupation and was confined to his home. Moreover he abstained from practically all of his social activities.

On June 21st, 1940, his condition was such that he consulted Dr. Walter T. Darden, with complaints of general weakness, fever, pains in back and chest, night sweats, loss of appetite and nervousness. Dr. Darden's findings on the occasion of this examination disclosed a temperature of 102.2 degrees, together with varied symptoms. The doctor made a diagnosis of acute pulmonary tuberculosis and lumbo-sacral sprain, and in the opinion of this doctor, the decedent required further treatment. The patient's back at that time was still strapped with adhesive. This physician was of the opinion that there existed a causal relationship between the strain suffered by the decedent on May 14th, 1940, and his condition. He testified the accident and its sequela had the effect of lowering the decedent's general body resistance to infection with the resultant activation or lighting up of an underlying quiescent tuberculosis.

The decedent continued to grow progressively worse and on July 8th, 1940, was attended by Dr. William H. Washington. He found the petitioner to be suffering from very rapid pulse which was weak and thready, marked dyspnea with difficulty in breathing. His skin was cold and clammy. He

testified that there was also present a cough with marked rales over the entire chest and that the patient's pulse and temperature were both high. He described the decedent too sick to even give a history at that time. The doctor ordered hospitalization of the patient and diagnosed the case as an acute miliary tuberculosis. This physician also found a causal relationship between the accident and the condition of the employee as disclosed by the examination. He testified that a lifting effort such as engaged in by the decedent set up an intrathoracic pressure which superimposed upon an existing focus of infection, would aggravate an underlying condition of tuberculosis.

Jenkins was admitted to the Newark City Hospital on July 11th, 1940, and Dr. S. Gehl of that institution examined the decedent and found him very weak, apathetic and perspiring profusely, with a temperature of 105 degrees. Rales were found over the entire chest and the abdomen was tender. X-rays taken there disclosed that the decedent was suffering from a miliary tuberculosis. This physician also was of the opinion that the trauma lighted up a tubercular focus of infection.

The health of the decedent failed rapidly and he died at the hospital on July 16th, 1940. Following his death, Dr. Leon Lewis, a pathologist, performed an autopsy on the decedent's body. After considering the findings disclosed by his autopsy, and the facts obtained from a question embodying all of the essential details, Dr. Lewis was of the opinion that there was a relationship between the lifting effort of May 14th, 1940, and the ensuing death in July 16th of that year. The autopsy indicated to him that in all probability the decedent possessed a pre-existing quiescent pulmonary tuberculosis and that there was an active focus of infection at the apex of the right lung. It was his opinion that the exertion and strain of the lifting effort of May 14th, 1940, caused an increase of intra-pulmonic and intra-thoracic pressure, so as to cause a seeding of the decedent's blood system with the infectious matter from the aforesaid pulmonary focus. His opinion in this regard was further fortified by the time element which elapsed between the strain and the ensuing

development of tubercular symptoms. Significantly the autopsy disclosed a miliary tuberculosis of a few weeks duration.

Dr. Harold S. Hatch, a specialist in diseases of the chest, also appeared on behalf of the petitioner and testified that in his opinion the trauma or strain caused a lowering of the decedent's body resistance to infection and played an important part in the acceleration of the underlying quiescent tuberculosis and the production of active symptoms therefrom. The decedent was thus rendered unable to ward off the infectious tubercular process. This expert also considered the time element as a factor in determining that there existed a causal relationship since the various symptoms appeared well within the time during which they would be expected to assert themselves, if they were related to the accident or strain. In his opinion, the appearance of said symptoms within three weeks after the trauma was well within the development period. The evidence established that the symptoms, which were subsequently diagnosed as those of tuberculosis, developed during the period in which the decedent was convalescing from the back injury, and when his body resistance to ward off the effects of a tubercular infection was below his normal recuperative powers.

The respondent offered the testimony of Dr. Szerlip, who treated the decedent for a lumbo-sacral sprain, on behalf of the employer. This, evidently, by reason of the fact that the petitioner manifested no active symptoms from any other condition at the time. Drs. M. J. Fine, Irving Applebaum and Barnet, the latter an interne, also testified on behalf of the respondent. While they were of the opinion that there was no relationship in this case between the accident and the death of Jenkins, an examination of their testimony indicates that they conceded as a general medical proposition, that trauma can and does result in the lowering of the bodily resistance of the victim to infection, and that a quiescent tubercular focci may thus be lighted up into activity and produce disability symptoms.

With the proofs in this posture, I am called upon to determine whether the employee's death and the admitted occupa-

tional accident are causally related. The respondent contends that the accident in question, resulted in injuries only to the lumbo-sacral area of the back and that they were not serious. Moreover, it is urged, the decedent failed to complain to Dr. Szerlip, the treating physician, concerning anything referable to his chest and lungs.

I am satisfied that had Dr. Szerlip been aware of any chest condition, he would have examined the employee with respect thereto, and would have either treated or arranged for such treatment to be furnished him. I am constrained to conclude, from all of the testimony and surrounding circumstances, that the petitioner during the period of his treatment by Dr. Szerlip, had no serious complaints referable to his chest and lungs. It was not until he was discharged from this doctor's treatment and was convalescing from the effects of the accident that the symptoms attributable to his tubercular condition manifested themselves sufficiently to render the employee cognizant thereof. In view of the expert medical testimony adduced, it is not only conceivable but quite probable that during the period of treatment from May 14th, to June 7th, the tubercular sysmptoms failed to assert themselves because they were in a stage of development and had not reached the point where they would be sufficiently distressing to impress themselves upon the consciousness of the victim.

To employ the reasoning of the Supreme Court in *Bobertz* v. *Township of Hillside,* 125 *N. J. L.* 321; 15 *Atl. Rep.* (2*d*) 796; affirmed, it is evident that the decedent's mental search for the cause of his disease from which he eventually died, may have proceeded slowly, not only because of the more distressing and acute phases of his back injury, but also by reason of the fact that in his untrained mind the accident did not loom large in his mind as a causative factor of his tuberculosis. In the case at bar as in the Bobertz case, the symptoms indicating an activation of a tubercular process, asserted themselves within what might well be called "the period of incubation." The preponderance of the credible medical testimony clearly indicates that such symptoms may well arise, as they did here, within two months after the accident and injury suffered by the victim.

I am satisfied from the proofs before me, that at the time of the decedent's accident, he possessed an underlying tubercular condition which evidently was quiescent and did not impede him in the performance of his laborious duties. Dr. Leon Lewis who performed the autopsy found what unquestionably appears to be an advanced stage of the diseased condition of the employee's lungs. The greater weight of the medical testimony leads me to the definite conclusion that the decedent at the time of the accident not only injured his back, but that his lungs were also subjected to an intra-pulmonic or intra-thoracic pressure which caused a seeping into his blood system of the infectious matter and material from the pulmonary focus. As a result, he suffered from a rapid or miliary spread of this disease which within a reasonable period of time following the accident, manifested itself in the symptoms described by the employee's several treating physicians. It may be accurately said that the ultimate effect of this strain upon his lungs did not become apparent for several weeks, but during that time there undoubtedly was a gradual deterioration within those organs of the employee.

I am convinced and so find that the sprain and injury which the petitioner suffered in the accident of May 14th, 1940, was the causative factor of a change in the condition of his lungs as was described in detail by Dr. Lewis in his testimony. I am satisfied from the proofs that a simple dissemination of the tubercle bacilli did not produce any manifestations until the tubercles began to form and that the decedent was not aware of the effect of his injuries upon his lungs until shortly after his discharge by Dr. Szerlip. I consider this period of time to be reasonable for causing such an effect. Here the decedent's tuberculosis was unquestionably activated and accelerated by the effects of the trauma to which he was subjected. Reaching the conclusion above indicated, I necessarily find as a fact that the accident as described and concerning which there is no dispute, hastened the death of the decedent.

A preponderance of the proofs favor the theory of the petitioner's case. The conclusions here reached are predicated upon the reasonable probabilities in this case. Our cases hold

that petitioner is not required to prove conclusively and beyond a doubt the causal relationship which she asserts. Her burden is only that of establishing her case by a credible preponderance of the evidence. Reasonable probability is the touchstone, not absolute medical certainty. *Aulen* v. *Johnston*, 115 *N. J. L.* 71; 178 *Atl. Rep.* 187; *Belyus* v. *Wilkinson, Gaddis Co.*, 5 *N. J. Mis. R.* 804; *Jackson* v. *New York Shipbuilding Co.*, 119 *N. J. L.* 542; 197 *Atl. Rep.* 284.

Considering the nature of the injury suffered in the accident, the time element, and the progress of the disease which eventually caused the employee's demise, I am satisfied and so find that the testimony produced by the petitioner, more than carries the burden of proof that there was a causal relationship between the accident and the death.

I therefore find and determine that the petitioner's decedent suffered injuries as a result of an accident arising out of and in the course of his employment with the respondent, and that his death was hastened thereby and that the respondent had due notice and knowledge of the accident.

\*        \*        \*        \*        \*        \*        \*

It is, therefore, \* \* \* determined and ordered that judgment be entered in favor of the petitioner \* \* \* and against the respondent \* \* \*.

HARRY S. MEDINETS,
*Deputy Commissioner.*