Monmouth County Court of Common Pleas.

CHARLES GLANTON, PETITIONER-APPELLEE, v. JOSEPH A. SHAFTO, RESPONDENT-APPELLANT.

Decided April 11, 1944.

For the petitioner-appellee, *Joseph F. Mattice.*

For the respondent-appellant, *Durand, Ivins & Carton* (*Robert V. Carton,* of counsel).

GIORDANO, C. P. J. This is an appeal from an award made by the Workmen's Compensation Bureau in favor of the petitioner, Charles Glanton, and against the respondent, Joseph A. Shafto.

The court has appraised the proofs and in my opinion they establish the following facts:

Charles Glanton, the petitioner-appellee, is a colored man, approximately 37 years of age, employed at Shafto's Garage (Joseph A. Shafto, respondent-appellant) as a handy man and mechanic's helper. He earned $22 a week. He took orders from Joseph Shafto and the head mechanic, one Fred Smith. He had thus been employed for at least one year prior to December 8th, 1941, when it is alleged he sustained an accident arising out of and in the course of his employment. In the garage were several fifty-gallon drums of alcohol which petitioner testified he was putting on end, or heading up, when he sustained an injury. He, Glanton, described the particular operation in the following words (page 3 of testimony):

"*A.* They were laying down, as you roll them, and I picked them up and put them on end, and when I lifted one——

*Q.* Well, how heavy were these barrels of alcohol?

*A.* I don't know just how heavy. They were fifty-gallon drums.

*Q.* You were heading them up, and what happened?

*A.* When I come down and come up with one, I choked right up, and my vein come right out, and I choked right up—the vein of my neck come out, and there was something in here, like I couldn't swallow—I drank a coca-cola. I went down in the back of the garage and sat around in the cars, and messed around the rest of the day.

*Q.* Did you talk to anybody in the place about this?

*A.* I told the boy.

*Q.* What boy?

*A.* I told Fred. I said, 'I got something. It might be indigestion, the way I choked up.' "

(And on pages 4 and 5 of the transcript, his testimony continues):

"*Q.* the following day, did you come back to work?

*A.* Yes, I did.

*Q.* Did you talk to anybody that day?

*A.* Well, no more than I told the other boy, if I bent over that day, if I had a tire to change, I would get dizzy in the head, and I still had that indigestion.

*Q.* And did you work the following day?

*A.* Yes.

*Q.* When did you go to the doctor, if you did?

*A.* Well, I worked on, and stayed on there until January, and on my neck the thing had come out so large until I couldn't button my shirt. * * * My face puffed up and I couldn't lift nothing or bend over, and Smith and Shafto's daughter said, 'You ain't got no indigestion. Something else is wrong with you. Go and see a doctor.' "

In answer to a question: "Did you go to a doctor?

*A.* Yes, I went to Dr. Edelson.

*Q.* Did Dr. Edelson treat you?

*A.* He looked at me and felt my blood vein and things and said, 'I want you to go to the hospital.' "

The proofs indicate that Glanton visited Dr. Samuel Edelson on January 16th, 1942, and according to Dr. Edelson, petitioner told him that he had had a cold for a number of days and first noticed the swelling of his neck about that time. He did not tell the doctor about any accident or give him a history of trauma or strain. Dr. Edelson could not make a definite clinical diagnosis and sent Glanton to the Fitkin Memorial Hospital for observation, where petitioner stayed for nine days and was examined by various doctors. Again, in February of 1942 Glanton was admitted to the Fitkin Memorial Hospital. In July, 1942, Glanton was sent by the doctors at the Fitkin Hospital to Dr. Charles P. Bailey of the Hahnemann Hospital, in Philadelphia. He remained at the Hahnemann Hospital for a few days and was sent back to Fitkin Hospital for bismuth treatments for syphilis preparatory to an operation which Dr. Bailey determined was necessary. He returned to the Hahnemann Hospital on October 18th, 1942, and on October 23d, 1942, Dr. Bailey performed an exploratory operation upon Glanton, at which time he made a clinical diagnosis of "thrombosis of the superior vena cava."

Having discovered the thrombosis, Dr. Bailey was prompted to obtain further history from Glanton as to the cause and he questioned Glanton as to possible strain. Although Glanton did not at first recall, or associate his condition with the particular operation of "heading up the drums" on or about December 8th, 1941, upon further questioning, it finally occurred to him that it was at that time, that is, while "heading up" the fifty-gallon drums, that the choked-up feeling manifested itself and it was then, according to his own testimony, that "the vein came right out—the vein of my neck, and I couldn't swallow—and drank coca-cola."

It is obvious that Dr. Edelson who first examined the petitioner, as well as the staff physicians at the Fitkin Memorial Hospital, were unable to make a definite diagnosis. And it is quite understandable that the petitioner, who, from his testimony, reveals a very meager educational background, could not associate the "lifting of the drums" with his condition.

A careful reading of the testimony convinces me that the petitioner-appellee was suffering from an unusual condition—a condition which is not too well known to the medical profession.

The testimony of Dr. Oscar V. Batson, a professor of anatomy at the Graduate School of Medicine, University of Pennsylvania (page 117 of transcript), discloses "that such a condition was first described by Von Schroedter, in Nothuagel Hand Buch in 1884, approximately seventy-five to one hundred cases have been described and carefully recorded from the various literatures, and how complete they have been able to log all the cases in the several foreign literatures is questionable. They are extensively described in English and only since 1910, in France and Italy. The occlusion of the superior vena cava is rather unusual although cases apparently have occurred; it cannot be denied the study we have had here of uniform—of simultaneous injections of both arms is not a common condition but it is a definite, established condition."

That Glanton did not at first connect the strain on December 8th, 1941, with his condition, is not a bar to his recovery.

This theory of the law is stated in the case of *General Cable Corp.* v. *Levins,* 122 *N. J. L.* 383; 5 *Atl. Rep.* (2d) 731. And in this case the rule is also established that notice to the physician of the respondent is such knowledge as meets all requirements of the act and secondly the only knowledge required is actual knowledge of the injury alone and not the resultant consequences thereof.

A careful reading and study of the above mentioned case satisfies me that the actual knowledge of the employer need not be either of the cause of the injury or of the resultant consequences thereof. It suffices if the employer had actual knowledge of the injury alone, which in the instant case, according to the proofs, the respondent had.

The medical testimony is voluminous, contradictory and of a highly technical nature. After carefully analyzing and appraising the medical testimony, I have concluded that greater weight should be placed upon the evidence of the treating physicians. The law to that effect is well settled in this state. *Jackson* v. *New York Shipbuilding Corp.,* 119 *N. J. L.* 542; 197 *Atl. Rep.* 284. With respect to diagnosis and causal relationship, I am constrained to the opinion that the testimony of the doctor who was in attendance of the petitioner and examined the petitioner post-operatively was obviously more informing than the opinion evidence offered by the respondent. *Bove* v. *Highwood Coal Co.,* 17 *N. J. Mis. R.* 131; 5 *Atl. Rep.* (2d) 728.

When the etiology of the condition such as complained of by the petitioner gives rise to controversy among medical authorities, in appraising the evidence it is my opinion that "probability and not the ultimate degree of certainty is the test." *Auten* v. *Johnston,* 115 *N. J. L.* 71; 178 *Atl. Rep.* 187.

The question to be determined therefore is whether or not the petitioner-appellee has established by a preponderance of probabilities the basis upon which he asserts his right to compensation as the result of an accident which arose out of and in the course of his employment. *Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *N. J. L.* 533; 6 *Atl. Rep.* (2d) 213; *Kuropata* v. *National Sugar Refining Co.,* 126 *N. J. L.* 44, 47; 17 *Atl. Rep.* (2d) 288.

In the Workmen's Compenstion Bureau the question was answered in the affirmative and the petitioner-appellee was awarded a judgment in his favor against the respondent-appellant. In the appraisement of evidence adduced before the Compensation Bureau, it is to be borne in mind that the Deputy Commissioner has the distinct advantage of personal observation of the witnesses, whose demeanor is ofttimes a factor of major importance in determining the probative value and weight of the evidence given. Hence, factual conclusions of the Compensation Commissioner to whom the evidence has been orally presented should not be lightly disturbed. *Mountain Ice Co.* v. *Durkin,* 6 *N. J. Mis. R.* 1111; 144 *Atl. Rep.* 6; *Berman* v. *Levenstein,* 9 *N. J. Mis. R.* 378; 154 *Atl. Rep.* 110; *Newell* v. *Workmen's Compensation Bureau,* 9 *N. J. Mis. R.* 1123; 157 *Atl. Rep.* 243; *Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *N. J. L.* 538, 539; 6 *Atl. Rep.* (2d) 213.

The Deputy Commissioner's findings, in my opinion, are not against the weight of the evidence and accordingly the judgment of the court below is affirmed.