LESLIE H. DOBSON, PETITIONER-RESPONDENT, v. CRU-
CIBLE STEEL CO. OF AMERICA, RESPONDENT-PROSE-
CUTOR.

Argued January 22, 1947—Decided February 20, 1947.

Before Justices BODINE, PERSKIE and WACHENFELD.

For the prosecutor, *Cox & Walburg* (*Arthur F. Mead*, of counsel).

For the respondent, *Greenstone & Greenstone* (*Isidor Kalisch*, of counsel).

The opinion of the court was delivered by

PERSKIE, J. This is a workmen's compensation case. *R. S.* 34:15–7, *et seq.* It is admitted that respondent suffered an accident which arose out of and in the course of his employment. Thus here the single question for decision is the *quantum* of total permanent disability suffered by the employee. In the Bureau that disability was fixed at 5% of total. On appeal to the Hudson County Court of Common Pleas, that court fixed the disability at 50% of total. The employer was allowed a writ of *certiorari*. Our independent appraisal of the facts and law (*Cf. Giles* v. *W. E. Beverage Co.*, 133 *N. J. L.* 137; 43 *Atl. Rep.* (2d) 286; *affirmed*, 134 *N. J. L.* 234; 46 *Atl. Rep.* (2d) 728) leads us to the conclusion that the result reached in the Pleas is right.

Leslie H. Dobson, repondent, was employed by Crucible Steel Company of America, prosecutor, for a period of about two years and eight months at its plant in Harrison, New

Jersey. He first did "pick and shovel" work and any other work he was told to do. Later he worked as a press operator. While working in the latter capacity, on May 7th, 1945, he was engaged in the act of raising a furnace door. A new cable had been placed in the block and it was longer than it should have been. The additional length of the cable became jammed in the block while respondent was trying to raise the door. When respondent tried to remove the cable, by pulling it up and down, the cable flew out of the block, struck him on the nose, between the eyes, and the loose wire ends punctured his forehead in several places. His face was covered with blood. He was so "dizzy" that he did not know what happened to him. He received first aid which included rest for about an hour. He also claimed that the force of the blow knocked him down although the history of the accident which he allegedly gave to the nurse at prosecutor's plant hospital does not so indicate. After receiving first aid treatment he was taken home. He reported for work the next day but, as he explained it, he could not do much and what he did "wasn't very good." He was treated for about two weeks at the plant hospital and then was discharged from further treatment.

Thereafter, beginning on May 16th, 1945, respondent received medical treatment for his continued headaches and dizziness from his own physician, a Dr. Harding. Respondent did not improve. But notwithstanding the fact that his dizziness and headaches persisted, he continued to work for prosecutor until August 15th, 1945 (V-J Day) when, in pursuance of a general lay-off, he was also laid off. Respondent's condition grew worse. He was again examined by Dr. Harding. This doctor found that in addition to the headaches and dizziness respondent "wasn't stable," lacked "equilibrium," suffered from "confusion and loss of memory." He became so "disordered" and "incoherent in speech" and suffered a marked loss of memory that the doctor, on September 27th, 1945, sent the respondent to the Bellevue Hospital in New York City.

While in the Bellevue Hospital, from September 27th,

1945, until October 11th, 1945, when he was discharged as "improved but not cured," respondent was examined and treated by a Dr. Pfeffer. This doctor was in the United States Public Health Service for almost three years and specialized in neuropsychiatry, neurology and psychiatry. At the time of the examination and treatment of the respondent this doctor was an instructor in the Department of Psychiatry at the Bellevue Medical School and was chief resident on the neurological service at the Bellevue Hospital. The conclusion reached by this doctor, after his examination and study of the respondent, was that he had suffered a "cerebral disease" in the region of the left side of the brain (Broca's area) which accounted for his difficulty of speech; and that respondent had an "additional lesion" in his brain, in the area called the internal capsule, thus causing weakness in respondent's right side and some "additional neurological signs on the right side of the body." Predominantly, respondent's difficulty of speech was his inability to find the correct word "to name an object," or in "naming a situation," or, in general, "in finding the correct word" although he knew what "he meant to say" but was "unable to say it." Respondent also had great difficulty in "performing skilled movements with his hands," and was unable to do "strenuous work." As already observed, while his condition was improved when he left the hospital, it was not cured.

Dr. Pfeffer did not appraise the permanent disability of the respondent. After respondent left the hospital, Dr. Harding continued and still treats him. The undisputed condition as found by Dr. Pfeffer presents the basic issue in this cause. Was there a causal relationship between the accident suffered by respondent on May 7th, 1945, and the condition of his brain, as disclosed by the examination made on September 27th, 1945? Or was the brain condition of the respondent, as urged for prosecutor, the result of "the ordinary cerebral thrombosis secondary to his cerebral arteriosclerosis," which in turn was also said to be "secondary to [respondent's] age, which was about fifty-seven years at the time of the hearing in the Bureau, on April 11th, 1946?

Dr. Pfeffer was of the opinion that there was a causal relationship between respondent's accident on May 7th, 1945, and the subsequent condition of his brain. The doctor was of the further opinion that it was not the result of an ordinary arteriosclerosis because such, in his opinion, is the result of a gradual process of deterioration whereas in the instant case it was apparently "acute in onset" and followed soon after respondent's "head injury."

Dr. Goldberg, a specialist in neurology and psychiatry, examined respondent on two occasions, August 29th, 1945, and January 31st, 1946. As a result of the first examination, the doctor "did not know how to evaluate [his] slight neurological findings." He could not make a "diagnosis of a focal lesion in the brain" but felt that the "picture was predominantly one of post-traumatic neurosis." He estimated a 7½% total permanent disability. As a result of a second examination this doctor testified that he "noted" some "psychomotor retardation," some "apathy of affect and slight confusion with some tendency to perservation of motor acts." There was a "mild apraxia disturbance" with occasional difficulty in finding the "proper word to say." There was also an "equivocal right facial weakness with a right hemipareses, the reflexes slightly greater on the right side than on the left." He fixed a "disability" of "approximately two-thirds of total." And he was of the opinion that there was a "reasonable probability" that the accident on May 7th, 1945, "initiated a chain of events which led to [respondent's] present disability."

Dr. Grossman, a specialist in mental and nervous diseases, testified for prosecutor. He examined respondent on December 26th, 1945. The result of this doctor's examination was that respondent suffered a "cerebrovascular lesion," on September 27th, 1945, which resulted in loss of his speech and the weakness and numbness on the right side of his body. In short, this doctor was of the opinion that respondent suffered the "ordinary cerebral thrombosis" secondary to his "cerebral arteriosclerosis"—which was "secondary to his age." And, therefore, in the doctor's opinion there was no causal

relationship between the accident and the injury sustained, although he allowed a 2% of total permanent disability for the "post-concussional syndrome" as the result of the accident of May 7th, 1945. We thus have the medical testimony of two treating physicians and of the two physicians who examined respondent for the purpose of testifying as experts, all fully qualified to testify.

In addition to the proofs adduced by the physicians, the proofs are undisputed that respondent, save for some common and inconsequential injuries sustained incident to his various prior work, enjoyed good health prior to the date of the accident. These proofs cover a period of fifteen years prior to respondent's employment by prosecutor. For about eleven of these years respondent operated a taxicab, as his own business, in the City of New York. For the following four years he worked for the W. P. A. operating a crane in connection with the construction of sewers and acted as a foreman during part of that period. He began, as already observed, his work with prosecutor as a common laborer. At no time during the fifteen years or the period that respondent worked for prosecutor, prior to the accident, did respondent suffer from dizziness or headaches, or otherwise, save the common minor injuries as noted.

Bearing in mind the proofs concerning respondent's prior good health, and the competent proofs of the physicians (*Cf. Consolidated Traction Co.* v. *Lamberlson,* 60 *N. J. L.* 452; 38 *Atl. Rep.* 683; *Sandford* v. *The Chanaz Co.,* 117 *N. J. L.* 485; 189 *Atl. Rep.* 670; *Brownsey* v. *General Printing Ink Corp.,* 118 *N. J. L.* 505, 512; 193 *Atl. Rep.* 824; *Hoffman* v. *Goldfield,* 129 *N. J. L.* 359, 360; 29 *Atl. Rep.* (2d) 876), we conclude that respondent has carried his burden of establishing by the preponderance of the probabilities according to the experience of mankind, that there was a causal relationship between respondent's accident on May 7th, 1945. and his subsequent brain condition, and that he suffered 50% of total disability as fixed in the Pleas. *Cf. Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *N. J. L.* 533; 6 *Atl. Rep.* (2d) 213; *Kramerman* v. *Simon,* 131 *N. J. L.* 250; 36 *Atl. Rep.* (2d) 132. The judge in the Pleas was not bound to arrive

at the exact *quantum* of damages fixed by the experts. His duty was to arrive at a percentage which he determined was just under all the competent proofs and circumstances. This he did. *Cf. Pacifico* v. *Carpenter Steel Co.*, 134 *N. J. L.* 149; 46 *Atl. Rep.* (2d) 381; *affirmed*, 135 *N. J. L.* 204.

The writ is dismissed, with costs.