17 N.J. Super. 339 (1952)
86 A.2d 39
ANNA FURDA, PETITIONER-RESPONDENT,
v.
SCAMMELL CHINA CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Mercer County Court Law Division.
Decided January 15, 1952.
*341 Mr. William Reich, attorney for petitioner-respondent.
Messrs. Toner, Speakman & Crowley (Mr. Robert A. Vanderbilt appearing), attorneys for respondent-appellant.
HUGHES, J.C.C.
This is an appeal from a determination and judgment entered in the New Jersey Department of Labor and Industry, Division of Workmen's Compensation, which held in favor of the petitioner-respondent, hereinafter called the petitioner. She is the widow of one, Michael Furda, who died shortly after suffering an injury which occurred in the course of his employment by the respondent-appellant, hereinafter called the employer. That judgment determined that decedent suffered an accident arising out of and in the course of his employment, that such accident caused his death and that petitioner at the time was wholly *342 dependent upon him within the meaning of our Workmen's Compensation Act. R.S. 34:15-13, N.J.S.A.
There is no contention on this appeal that there was lack of notice or knowledge of the accident and it is further obvious that the accident, whether or not compensable, arose in the course of the employment. Bryant, Adm'x. v. Fissell, 84 N.J.L. 72 (Sup. Ct. 1913).
The appeal goes to three fundamental bases of the judgment. It contests the fact of accident arising out of the employment; it suggests an alternative theory of the cause of death in derogation of the causal link between the traumatic accident and the death; and, it challenges the proof of total dependency of petitioner upon decedent.
The physical facts surrounding the injury and death, as distinguished from the medical conclusions voiced concerning them, are not in substantial dispute, and upon the basis of the whole record and transcript of evidence, I find these facts to be as follows:
Decedent was a kiln-drawer at the plant of the employer in Trenton and on the day of his death was pursuing his regular work in association with three other employees. This work at the time consisted of processing certain boxes, at a work table or bench faced by such employees, preparatory to taking the boxes a short distance away for washing. Directly behind these workers, and some 4 or 5 feet from the table, there was a depression in the concrete floor about 10 feet in width and 27 inches deep. This "pit" had a concrete floor and two sets of metal tracks on which ran small flat cars which transported working materials to the men at the table. When these cars were in place in the pit, their flat tops were even with the floor, really amounting to a continuation thereof, but when the cars were absent, the pit constituted, of course, a rather substantial drop, unprotected by guard rail of any kind.
Shortly before 2:00 P.M., while the fellow employees of decedent were momentarily absent from the table, carrying the boxes they had assembled for the short distance necessary *343 to wash them, and while decedent was piling a group of boxes for the same purpose, these latter boxes were heard to fall and were found near the table. The decedent apparently collapsed or fell into the pit referred to during the few seconds he was out of the view of his fellows. They found him lying on his back with his head against the second rail from the concrete floor, bleeding from the nose and the back of his head, and unconscious. He was taken to hospital immediately and died there at 2:40 P.M. Before the incident referred to, he had seemed completely normal, in jovial mood and without complaint.
Shortly after death, an autopsy was performed by Dr. David Eckstein, a specialist in this field. There were found fragmented compound fractures of the occipital and parietal bones of the skull, resultant hemorrhages beneath and outside the dural membrane, a cerebellar laceration and a subarachnoid hemorrhage. These hemorrhages and laceration were caused by the fractures and the witness testified that such fractures and associated injuries to the brain caused the death of decedent. This doctor had also noted evidence of intraventricular hemorrhage, which he thought was non-traumatic in origin although he could not determine the time relationship of such bleeding to the traumatic injuries to the skull and brain which caused death, and thus he did not undertake to comment on the possible independent effect of the former, if any.
The two medical witnesses of the employer opined that the intraventricular bleeding was non-traumatic in origin and that it was the immediate cause of the fall of decedent into the pit. They further thought, in view of certain hypertrophic changes in the heart, the age and probable blood pressure of decedent, with the consequent probability of some degree of benign hypertension, that there was produced a condition of susceptibility to a fatal cerebral hemorrhage, which, primarily, enabled them to attribute the cause of death exclusively to this non-traumatic cerebral incident.
*344 The cleavage in this evidence requires careful examination of the weight of these conflicting medical opinions. I am bound to say that such analysis seems to me to weigh clearly in favor of the views of the physician who performed the autopsy and thus observed these conditions at first hand. The logic of his conclusions is impressive, much more so by reason of his hesitancy to speculate on the time of occurrence and the possible independent effect of the intraventricular bleeding. On the other hand, the chain of conclusions upon which rests the opposing medical case is very tenuous. This case is based solely upon answers to hypothetical questions. Reason would seem to seek out a very compelling basis for the defense conclusion that death ensued, independently, from cerebral bleeding which probably preceded a fall of such violence as to cause the fractures and brain injuries described. This is particularly true when such traumatic injuries are conceded to be of a fatal type in and of themselves. I do not find in the evidence any explanation of such positive opinion, which appears to me to be other than speculative. One defense witness attached unjustified significance to the order in which the autopsy surgeon listed his observations in his protocol, as though such notations indicated the chronological order of the events whose results were thus noted down; for this reason such witness concluded that the intraventricular hemorrhage preceded and caused the fall into the pit. This witness finally declared that either injury could have caused death, or the non-traumatic hemorrhage and the fracture results combined could have caused it, and that no one could determine the cause of death with any degree of certainty. The other medical witness for the defense rested his opinion in major part upon the interval elapsing before death, indicating that the fracture and its results would normally have caused a period of decompression and coma, with ensuing death of less rapidity than that resulting from intraventricular hemorrhage. He was, moreover, guided by the fact that there was no slippery object or obstruction on the floor which might have caused *345 the workman naturally to fall into the pit. This seems to me to weaken his terminal conclusions and indicate that his opinion might be quite different except for the speculative belief that an independently fatal cerebral stroke caused this fall. So too, I feel that the defense medical opinions, as based on the assumed hypertensive state of the workman, are speculative in the extreme.
Accordingly, I find and determine that the intraventricular hemorrhage, although it may well have caused the workman to fall from the platform, did not cause death. Moreover, were I called upon to determine whether such hemorrhage was a remote cause of death, i.e., whether it caused the workman to fall into the pit, it would be impossible to determine that by any preponderance. The proofs of its incidence and its effects alike are hazy and speculative. Evidence of this type is insufficient to defeat recovery. Jackson v. N.Y. Shipbuilding Corp., 119 N.J.L. 542 (Sup. Ct. 1938); Harris v. City of Newark, 19 N.J. Misc. 95, 17 A.2d 600 (N.J. Dept. Labor 1941); Cavallaro v. Supreme Decorating Corp., 137 N.J.L. 426, 60 A.2d 66 (Sup. Ct. 1948).
I further find and determine from the evidence that the immediate, direct and proximate cause of death comprised the fractures and resulting injuries to the brain. The weight of evidence to establish compensable accidental death within the contemplation of our act is settled in this State. That evidence may be circumstantial, if it be such as to afford a basis of rational inference of the occurrence to which it relates. This standard is, in final analysis, a preponderance of probabilities and all that is required is that the claimed conclusion from the offered facts must be a probable or more probable hypothesis, with reference to the possibility of other hypotheses. Jackson v. D., L. & W.R.R. Co., 111 N.J.L. 487 (E. & A. 1933); Belyus v. Wilkinson, Gaddis & Co., 115 N.J.L. 43 (Sup. Ct. 1935). This test frequently concludes the issue in cases where a workman is found dead or injured and the surrounding physical circumstances are *346 depended upon to determine the nature of the unseen fall or accident which must have occurred. Muzik v. Erie R.R. Co., 85 N.J.L. 129 (Sup. Ct. 1914); DeFazio v. Goldschmidt Detinning Co., 87 N.J.L. 317 (E. & A. 1915); Manziano v. Public Service Gas Co., 92 N.J.L. 322 (Sup. Ct. 1918); Pacelli v. Janowitz Bros., 5 N.J. Misc. 474 (N.J. Dept. Labor 1927); Irons v. Hause Washed Gravel and Sand Co., 6 N.J. Misc. 863 (N.J. Dept. Labor 1928); Mountain Ice Co. v. Durkin, 6 N.J. Misc. 1111 (Sup. Ct. 1928); Brooks v. Essex Warehouse Co., 137 N.J.L. 206 (E. & A. 1948); Jochim v. Montrose Chemical Co., 3 N.J. 5 (1949); Kelly v. Hackensack Water Co., 10 N.J. Super. 528 (App. Div. 1950).
This rule of the preponderance of probabilities embraces, of course, the field of medical evidence and opinions, and in the very nature of that type of evidence would seem especially and necessarily adaptive thereto. Jackson v. N.Y. Shipbuilding Corp., 119 N.J.L. 542 (Sup. Ct. 1938); Fierro v. Public Service Coordinated Trans., 18 N.J. Misc. 597, 16 A.2d 72 (N.J. Dept. Labor 1940), affirmed 131 N.J.L. 552, 37 A.2d 649 (Sup. Ct. 1944); Andres v. Keystone Varnish Co., 19 N.J. Misc. 74 (N.J. Dept. Labor 1941); Weisenbach v. Borough of New Milford, 134 N.J.L. 506, 48 A.2d 802 (Sup. Ct. 1946); Dobson v. Crucible Steel Co. of America, 135 N.J.L. 263, 51 A.2d 434 (Sup. Ct. 1947).
Having so determined that death was causally related to the fractures and brain injuries sustained by the fall of decedent into the pit and was not the result of the non-traumatic cerebral hemorrhage unrelated to the employment, it remains to determine whether death resulted from "an accident arising out of and in the course of the employment." It may not be gainsaid that the fall, with its resultant injuries, amounted to an industrial accident within the statutory meaning, being "an unlooked for mishap or untoward event which was not expected or designed," and further that such accident arose "in the course" of the employment. Bryant, *347 Adm'x. v. Fissell, supra; Bollinger v. Wagaraw Building Supply Co., 122 N.J.L. 512 (E. & A. 1939).
The employer insists that it did not arise "out of" the employment, because the fall itself was precipitated by a non-traumatic cerebral hemorrhage in the nature of a stroke, entirely unrelated to the employment, and presumptively due to natural causes. It categorizes the fractures and associated brain damage as mere further injuries suffered in the course of the cerebral accident. It classifies the cerebral accident with the "heart doctrine" cases typified by Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156 (Sup. Ct. 1946), affirmed 135 N.J.L. 352 (E. & A. 1949).
Initially, this record does not establish any probability of hypothesis that the fall was induced by cerebral collapse rather than by carelessness, confusion, stepping backward, or other movement in the course of the work decedent was doing. Moreover, the assumption of such fact would not avail the employer. An accident arises out of the employment when it is something the risk of which might have been contemplated by a reasonable person when entering the employment as incidental to it. A risk is incidental to the employment when it belongs to or is connected with what a workman has to do in fulfilling his contract of service. Moreover, a risk may be incidental to the employment when it is either an ordinary risk directly connected with the employment, or an extraordinary risk which is only indirectly connected with the employment, owing to the special nature of the employment. Such are the established criteria, on this phase, of an industrial accident under our act. Bryant, Adm'x. v. Fissell, supra; Reynolds v. Passaic Valley Sewerage Commrs., 130 N.J.L. 437 (Sup. Ct. 1943). The risk of a fall into the pit described was certainly a clearly observable hazard of this employment, and it was very near the place of, and incidental to the work decedent was required to do. It was a risk directly connected with the employment. If, in the course of his work, the decedent had stumbled or slipped without apparent outside cause into this pit, there *348 would be little doubt that such would comprise a compensable industrial accident. Additionally, this pit was an extraordinary risk as distinguished from one common to the neighborhood, for it was a hazard only to the employees rightfully on the premises in the discharge of their duties.
These considerations leave in sharp focus the materiality of the contention that this fall was induced by a physical seizure unrelated to the employment. It would appear to be the clear weight of authority that whenever conditions attached to the place of employment, or otherwise incident to the employment, are factors in the catastrophic combination, the consequent injury arises out of the employment. Thus, injuries caused by falling and being wedged against a hot stove on the premises of, and in the course of the employment, during an epileptic fit, are viewed as resulting from an accident arising "out of" the employment. Reynolds v. Passaic Valley Sewerage Commrs., supra. In the case of Connelly v. Samaritan Hospital, 259 N.Y. 137, 181 N.E. 76 (1932), the Court of Appeals in New York held compensable an accident in which the worker, due to a cardiac incident, fell against a table in her place of employment and sustained injuries from such fall. In that case, Chief Judge Lehman said:
"`A physical seizure unrelated to the employment is not such an accident as is compensable. * * * It is the fall and injury resulting from it that constitutes an accident within the purview of the statute. The cause may be disregarded and the inquiry limited to an investigation to disclose whether the fall, having occurred, bore with it such consequences as would not have occurred except for the employment.' * * * Thus where the primary cause of the accident must be eliminated because it has no relation to the employment, the inquiry proceeds to possible co-operating causes which produced the injury. The test is the same. If, except for the employment, the fall, though due to a cause not related to the employment, would not have carried the consequences it did, then causal connection is established between injury and employment, and the accidental injury arose out of the employment. The employment has subjected the workman to a special danger which in fact resulted in injury."
*349 The same rule has been applied where a workman fell into a fire during a paralytic stroke (Ervin v. Industrial Commission, 364 Ill. 56, 4 N.E.2d 22 (Sup. Ct. Ill. 1936)); where a workman fell down a stairway during an epileptic seizure (Cusick's Case, 260 Mass. 421, 157 N.E. 596 (Sup. Ct. Mass. 1927)); or where a workman fell against a welding machine during an epileptic fit (Industrial Commission of Ohio v. Nelson, 127 Ohio St. 41, 186 N.E. 735 (Sup. Ct. Ohio 1933)).
I do not consider that the employer's reference to the "heart" cases (Lohndorf v. Peper Bros. Paint Co., supra) is relevant on this appeal, for in such cases injury ensued from the heart incident itself, or at the most, from a persistence in normal, although contra-indicated work, and not from a separate traumatic injury resulting from a collapse due to the heart attack. It may be assumed here, in any case, without difference in result, that if a cerebral hemorrhage preceded this fall, it arose from physiological causes unrelated to the employment.
Any degree of hypertension or any other physical involvement which predisposed the decedent to cerebral accident is likewise immaterial under these circumstances. There is no requirement that an employee be in perfect condition before accident, for the employer accepts his employees with their mental, emotional, glandular and other physical defects and disabilities. Marshall v. C.F. Mueller Co., 135 N.J.L. 75 (Sup. Ct. 1946).
Petitioner and decedent were living apart at the time of his death and for some years prior thereto. I find from the facts that this was due to his fault and was neither acquiesced in nor consented to by her; that she never asserted her independence of her husband, but on the contrary asserted at all times her legal dependence upon him; and that this claim of dependence was crystallized, inter alia, in periodic support payments by him to her on a continuing basis. From the record and transcript of evidence, I find that she was a total dependent within the meaning of our *350 act. Alexander v. Cunningham Roofing Co., Inc., 124 N.J.L. 390 (Sup. Ct. 1940), affirmed 125 N.J.L. 277 (E. & A. 1940); Jefferson v. Interstate Metals Co., 134 N.J.L. 110 (Sup. Ct. 1946); Fitzsimmons v. Federal Shipbuilding & Dry Dock Co., 4 N.J. 110 (1950).
I conclude that the petitioner has established that her husband died as the result of an accident arising out of and in the course of his employment, that the respondent had due notice thereof and that she was totally dependent upon him. I will, therefore, enter judgment in favor of the petitioner and against the employer and pursuant to Rule 3:52, counsel may present, on proper notice, proposed findings of fact, conclusions of law and form of judgment consistent with the foregoing, which should embrace also the details of nonissuable matters such as the compensation rate and the like.